**UNITED STATES of America, Appellee,**

v.

**Dale Edward AILPORT, Appellant**
(Two Cases).

Nos. 91–2465, 93–2072.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 14, 1993.

Decided Feb. 17, 1994.

Counsel who presented argument on behalf of the appellant was Charles Hawkins, Minneapolis, MN.

Counsel who presented argument on behalf of the appellee was Richard Morgan, Minneapolis, MN.

Before MORRIS SHEPPARD ARNOLD, Circuit Judge, and HEANEY and ROSS, Senior Circuit Judges.

HEANEY, Senior Circuit Judge.

Dale Edward Ailport was convicted of aiding and abetting the distribution of methamphetamine in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). He was sentenced to 360 months imprisonment as a career offender under section 4B1.1 of the sentencing guidelines. Ailport appeals both his conviction and sentence, his primary contention being that the government suppressed evidence favorable to his defense. We affirm.

### I.

The arrests of Ailport and co-defendant Thomas Hoff resulted from an undercover investigation into the distribution of methamphetamine during March and April 1990. Special Agent Gary Pederson and Deputy Sheriff James Kowalczyk ("the agents")[1] bought methamphetamine from Hoff on several occasions. The transaction that led to Ailport's arrest and conviction occurred at Hoff's residence on April 24, 1990. The testimony, viewed in the light most favorable to the verdict, supports the following version of events concerning that transaction. Early in the evening on April 24 the agents arrived at Hoff's home to buy methamphetamine. VI Tr. 53. Ailport entered the residence between fifteen and forty-five minutes after the agents had arrived. II Tr. 68; III Tr. 34–35, 137; VI Tr. 53–54. Ailport immediately went with Hoff into the bedroom. II Tr. 68; III Tr. 138. A few minutes later Hoff emerged from the bedroom carrying a bag of methamphetamine. II Tr. 67; III Tr. 138. He went into the kitchen, locked the door, and went over to the table where the two agents were sitting. III Tr. 1383–39. Ailport left the bedroom and joined the agents at the table. II Tr. 68; III Tr. 139. Hoff handed the methamphetamine to Ailport, who began to discuss the drug's quality and price. II Tr. 68–69; III Tr. 139. He also discussed future drug transactions with them. II Tr. 69; III Tr. 140.

As soon as the agents left Hoff's residence, they signaled other law enforcement agents to enter the premises and arrest Hoff and Ailport. Ailport was charged with one count of conspiracy to distribute methamphetamine and four counts of aiding and abetting the distribution of methamphetamine on various dates in March and April 1990. After a jury trial, he was convicted of one count of aiding and abetting the distribution of methamphetamine on April 24, 1990. The jury acquitted him of the other four counts. Ailport moved for a new trial on the grounds of newly discovered evidence and the government's failure to disclose favorable evidence. The district court denied his motion and sentenced him to 360 months imprisonment as a career offender under the sentencing guidelines. *See* U.S.S.G. § 4B1.1.

### II.

The most serious issue raised by Ailport is whether the government failed to disclose information to Ailport as required by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A prosecutor's suppression of evidence favorable to an accused violates due process when the evidence is material to the issue of guilt or punishment, regardless of the prosecutor's good faith or bad faith. *Id.* at 87, 83 S.Ct. at 1196–97. To find a violation of *Brady*, the evidence must be material, favorable to the defense, and suppressed by the prosecution. *Cornell v. Nix*, 976 F.2d 376, 382 (8th Cir. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1820, 123 L.Ed.2d 450 (1993).

Ailport claims the government violated *Brady* by failing to disclose that a man named Thomas Munoz was cooperating with the government in an unrelated murder investigation and that the government possessed tapes demonstrating that Munoz, not Ailport, was the source of the methamphetamine sold on April 24. Ailport states that Munoz had allowed the government to record conversations between Munoz, his wife, and murder suspect Robert Gassler in which Munoz stated that he brought methamphetamine into Minnesota during the time period covered in the indictment against Ailport and

---

1. Pederson is a special agent of the Minnesota Bureau of Criminal Apprehension, and Kowalczyk is a deputy sheriff in Chippewa County, Wisconsin. Both men are members of the West Central Drug Enforcement Group.

Hoff. A major issue at trial was the identity of Hoff's supplier or suppliers for the various drug transactions in March and April 1990 that were charged in the indictment. Ailport maintained at trial that he never supplied Hoff with methamphetamine and that he played no role in the April 24 sale of methamphetamine to undercover agents and was in Hoff's bedroom when that sale took place.

There is no dispute that the prosecution failed to disclose the Munoz tapes to Ailport before trial. To decide whether there has been a violation of *Brady* we must therefore examine whether the tapes were "favorable" to Ailport and "material" to his guilt. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).

The first and simplest aspect of Ailport's *Brady* claim is that the Munoz tapes corroborate his defense theory that Munoz was one of Hoff's methamphetamine suppliers. The contents of the tapes were finally disclosed and discussed at a post-trial evidentiary hearing. Contrary to Ailport's assertions, the tapes do not clearly establish that Munoz supplied methamphetamine to Hoff during March and April 1990. Rather, the record shows that the taped statements are ambiguous on that issue. There is no mention of Hoff, Ailport, or methamphetamine distribution on the tapes. Gassler, the other party to the conversations, does make several references to "shit" and "speed," which in some instances can be read to refer to methamphetamine or some other stimulant drug. In other portions of the tape, "shit" seems to refer to a shotgun allegedly used in the murder under investigation and to other property belonging to Gassler. The tapes do not contradict Ailport's theory that Munoz was one of Hoff's suppliers but neither do they provide any specific evidence to support either that theory or the position that Ailport was *not* a supplier.

■ While the tapes may be considered somewhat "favorable" to Ailport's defense, we do not find them "material" to his guilt for aiding and abetting the distribution of methamphetamine on April 24. The undercover agents testified that Ailport participated in that sale by handling the methamphetamine and discussing price and quality. The identity of the original source of the methamphetamine sold on April 24 is not relevant to Ailport's conviction for aiding and abetting that sale, and there is no basis to think the Munoz tapes would affect that result.[2]

■ The second and more convoluted aspect of Ailport's *Brady* argument is his contention that, apart from the contents of the tapes themselves, the government's failure to disclose Munoz' cooperation with the government in the murder investigation of Gassler hindered Ailport's ability to cross-examine witnesses about whether Munoz was one of Hoff's methamphetamine suppliers. Hoff's counsel informed the court that Hoff feared Munoz would kill him if there was any indication at trial that Hoff had ever implicated Munoz in any methamphetamine deals or in the murder that was under investigation, and indeed the prosecutor agreed that Hoff's life could be in danger if certain questions about Munoz were pursued. VI Tr. 75–76, 78. The district court asked counsel for both defendants whether it was possible to rephrase questions concerning whether Munoz was Hoff's methamphetamine supplier, and the court also indicated that questions about Munoz' involvement in the separate murder investigation would not be relevant. VI Tr. 80–82. Ailport's counsel then agreed to a

---

2. The government seems to suggest that because Ailport was acquitted of the counts that turned on the identity of Hoff's suppliers, the suppressed evidence relating to that issue could not be material to the count of conviction. Our review of the record in this case has led us to conclude that the evidence was, in fact, not material to the count of conviction. We can, however, envision cases in which the suppression of evidence that is only directly relevant to acquitted counts might nonetheless be material to the count of conviction. For example, the suppression of such evidence might prevent impeachment of a witness whose testimony also supported the count of conviction. Because our holding today does not rely on the government's argument, we need not reach this hypothetical.

suggestion by Hoff's counsel that, instead of asking a witness whether Hoff ever named Munoz as one of his sources of methamphetamine, the same result could be achieved by asking whether Hoff ever named Ailport as a source. VI Tr. 83–84.

Ailport contends that, had he and Hoff known that Munoz was cooperating with the government, Hoff would not have been afraid of Munoz, and Ailport would have felt free to pursue more aggressively the cross-examination of the government agents about whether Hoff ever identified Munoz as one of his suppliers. A review of the transcripts shows that Ailport's counsel did at times refrain from referring to Munoz by name, but he did so voluntarily, at the suggestion of co-defendant Hoff's counsel. The district court did not impose restrictions on cross-examination except to indicate that questions about Munoz' involvement in the separate murder investigation were not relevant. More important, the record shows that Ailport's counsel was not impeded in his cross-examination of the law enforcement agents. On the contrary, his questioning very effectively elicited information that pointed to sources of methamphetamine other than Ailport. He established alternate explanations for the source of the methamphetamine on the relevant dates in March and April 1990: that Hoff had the methamphetamine on his person or stored in his bedroom and only pretended to make visits to a supplier, that other persons who met with Hoff and the undercover agents were the suppliers rather than Ailport, and that during Hoff's visits to Ailport's Payne Avenue neighborhood Hoff actually obtained the methamphetamine from a "stash house" rather than from Ailport's residence. The acquittals on four of the five counts against Ailport are attributable at least in part to the effectiveness of the cross-examination.

Information about whether Munoz was cooperating with the government in an unrelated murder investigation would not be "material" to Ailport's guilt in light of his acquittal on four counts and the ample evidence of guilt on the one count of conviction. The testimony at trial already established that persons other than Ailport, both identified and unidentified, had the opportunity to supply Hoff with methamphetamine in March and April 1990. The jury credited that testimony when it acquitted Ailport on all counts except the single face-to-face transaction in which Ailport was involved. We do not see how adding Munoz' name to the list of suppliers or mentioning his cooperation with the government would influence, much less undermine, the jury verdict of guilt concerning Ailport's participation in the April 24 sale of methamphetamine to the undercover agents.

### III.

Ailport makes several additional challenges to his conviction. In a variation of his *Brady* claim he asserts that he is entitled to a new trial based on the newly discovered evidence of Munoz' tape-recorded conversations and that the absence of this information at trial violated his Sixth Amendment right to confront witnesses. He also contends that the evidence at trial was insufficient to support his conviction, prosecutorial misconduct during closing argument denied him a fair trial, and the district court abused its discretion in refusing to sever his trial from that of his co-defendant Hoff. After reviewing each of these arguments, we conclude that they are without merit.

### IV.

■ Ailport argues that his 360–month sentence as a career offender violates the Eighth Amendment's prohibition of excessive punishment because the sentence is disproportionate both to his offense of conviction and to the sentence received by his co-defendant Hoff. *See Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); *United States v. Johnson,* 944 F.2d 396 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 646, 116 L.Ed.2d 663 (1991). We find no support for Ailport's arguments and conclude that the district court properly calculated his sentence as a career offender. *See* U.S.S.G. § 4B1.1.

For the foregoing reasons we affirm Ailport's conviction and sentence.