STATE OF NEBRASKA, APPELLEE, V. FRANCES L. THOMPSON, APPELLANT.

523 N.W.2d 246

Filed October 28, 1994.    No. S-94-049.

Patricia Knapp and Bruce Ellison for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HASTINGS, C.J., WHITE, FAHRNBRUCH, LANPHIER, and WRIGHT, JJ., and BOSLAUGH, J., Retired.

HASTINGS, C.J.

The defendant, Frances L. Thompson, appeals from the judgment of the district court which overruled her motion for a new trial. Actually, Thompson filed one motion on May 24, 1993, claiming newly discovered evidence, and a supplement to that motion on November 23, claiming prosecutorial misconduct in withholding potentially exculpatory materials. The trial court ordered that "the Motion for New Trial based on newly discovered evidence is overruled and the Motion for New Trial based upon prosecutorial misconduct is overruled." Thompson's sole assignment of error is as follows:

> The Trial Court erred in denying the Defendant's Motions for New Trial for the suppression of potentially exculpatory and impeaching evidence and information which leads to such evidence, in violation of the Defendant's Rights to Due Process of Law, including her Rights of Confrontation and a Fair Trial.

On August 19, 1992, a jury convicted Thompson of first degree murder and use of a firearm to commit a felony in the killing of Dean Frank. Thompson directly appealed, and this court affirmed the jury's verdict and the judgment of the

district court. *State v. Thompson*, 244 Neb. 375, 507 N.W.2d 253 (1993) *(Thompson I)*. In the present appeal, Thompson does not challenge the trial court's finding that the death certificate is not newly discovered evidence.

## STANDARD OF REVIEW

An appellate court reviews a motion for new trial on the basis of prosecutorial misconduct for an abuse of discretion of the trial court. *State v. Boppre*, 243 Neb. 908, 503 N.W.2d 526 (1993). A trial court abuses its discretion when its rulings are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result. *State v. Trackwell*, 244 Neb. 925, 509 N.W.2d 638 (1994). At the heart of Thompson's argument that the prosecutor suppressed material evidence is the right to a fair trial mandated by the Fifth Amendment to the U.S. Constitution. See *United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). Irrespective of a prosecutor's good or bad faith, suppression of material evidence favorable to an accused violates due process. *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). In addressing materiality, we must evaluate the omitted evidence in the context of the entire record. *United States v. Agurs, supra.* If the evidence creates a reasonable doubt of guilt that otherwise did not exist, then a constitutional error has been committed. *State v. Atwater*, 245 Neb. 746, 515 N.W.2d 431 (1994).

## FACTS

The facts as adduced at Thompson's trial are detailed in *Thompson I*. We repeat only those facts which are necessary for a decision on this appeal.

The Knox County Sheriff's Department arrested Thompson on August 18, 1991, charging her with first degree murder and use of a firearm to commit a felony regarding the August 18 murder of Frank. According to Thompson's statement of the events of August 18, Frank entered her house with groceries which he put in Thompson's refrigerator. Frank then approached Thompson, screaming something which Thompson was sure amounted to "I'm going to kill you." Thompson responded by picking up a .357 Magnum revolver, and when Frank moved closer to Thompson, she rapidly fired

six shots at him. Thompson then called the sheriff's office to report the incident and reloaded her gun. According to Thompson, she had a friendly discussion with the victim until rescue personnel and deputies arrived. Despite efforts at cardiopulmonary resuscitation by the rescue squad, Dr. Ken Pavlik of Verdigre pronounced Frank dead at 7 p.m.

Similar to Thompson's account, Sheriff Wes Eisenbeiss reported that at 5:35 p.m. on August 18, Thompson called and reported a shooting at her residence, stating, "I just shot somebody. He came in my house. He was going to kill me."

Upon arriving at the Thompson residence, however, Deputy Don Henery observed bullet holes in the floor "at such an angle that the person would be shooting . . . downward . . . towards the floor." Deputy J.F. Janecek examined the crime scene and determined that Frank was hit with multiple rounds from a .357 Magnum revolver and that bullet hole angles in the floor indicated that Thompson fired three shots as Frank lay on the floor. Deputy Janecek stated that "it appeared to me that those three rounds had indeed missed Mr. Frank . . . because of the fact that there were no blood splatters or blood marking around the entry holes of these bullets into the floor."

Deputy Henery observed Frank's autopsy and noted six wounds inflicted on the victim. Dr. Brad Randall, the pathologist who performed the autopsy, advised Deputy Henery that two wounds were fatal. The bullet that entered the right rear area of Frank's back and exited the right front part of the abdomen was "definitely" fatal "because the liver was destroyed by the bullet as it passed through the body" leaving "no chance of survival." Furthermore, the bullet that entered the left front abdomen and exited the left rear area of Frank's back "could also have been a fatal shot, because of damage to the one kidney and a bowel." Dr. Randall however advised that "Frank could probably have survived [the kidney wound] if this had been the only wound."

Dr. Randall's autopsy report indicated that Frank suffered three gunshot wounds. The gunshot wound "to the right back passing through the liver and right lung" and the gunshot wound "through the lateral left mid-abdomen passing through loops of bowels and the left kidney" were "sufficient to

represent the cause of death." The third gunshot wound entered the "right buttocks resulting in a partial fracture of the neck of the right femur."

During the trial, Dr. Randall testified that Frank could have lived only 10 to 15 minutes after suffering the gunshot wound to the liver and lung. Furthermore, according to Dr. Randall, Frank appeared to survive the wound to the upper left abdomen for some time. Thus, Dr. Randall believed that the three gunshot wounds were not inflicted at the same time and that Thompson possibly fired the fatal shot to Frank's right back shortly before the sheriff's department and rescue personnel arrived. *Thompson I.*

The Knox County Attorney, John Thomas, signed Frank's death certificate, certifying that Frank died at 7 p.m. on August 18, 1991. The remaining portion of the death certificate, which Thomas was responsible for filling out, indicated the immediate cause of death as multiple trauma due to gunshot wounds to the abdomen and the time interval between onset and death as 1 hour 25 minutes.

Prior to trial, the district court denied Thompson's motion for recusal of the county attorney, which motion alleged that he was a potential defense witness. On May 26, 1992, Thompson moved for discovery of reports and documents regarding Frank's death prepared by the county attorney in his capacity as county coroner. On June 1, the trial court denied the discovery motion. On August 19, the jury found Thompson guilty of first degree murder and use of a firearm to commit a felony.

On May 24, 1993, more than 9 months after her conviction, Thompson moved for a new trial, stating that in April 1993, her counsel received a copy of Frank's death certificate "from an individual who managed to obtain it earlier in the month." According to Thompson, the death certificate substantiated her trial argument that at approximately 5:30 p.m., she shot Frank three times in the abdomen and then called the sheriff to report the shooting, and at 7 p.m., Frank died from the gunshots. Thompson claimed that the death certificate would have made the county attorney a material witness in her defense and probably resulted in her acquittal. Thompson submitted as an exhibit a May 15, 1992, letter from her counsel to the county

attorney requesting reports and interviews regarding Frank's death prepared and conducted by the county attorney in his capacity as coroner.

On July 7, 1993, the district court held a hearing on Thompson's motion. Thompson argued that she attempted to obtain coroner documents, but the county attorney denied her access. According to Thompson, the county attorney should have disclosed the death certificate as exculpatory and substantial impeaching evidence. Thompson argued that the death certificate not only substantiated her contention, but was inconsistent with Dr. Randall's testimony that the fatal wound killed Frank within 10 to 15 minutes. Thompson's direct appeal was still pending before this court; therefore, the district court held that it did not have jurisdiction and allowed the motion to pend.

On November 23, 1993, Thompson filed a supplement to her motion for a new trial. Thompson alleged that during the June 1, 1992, hearing the county attorney misled defense counsel to believe that there did not exist any exculpatory evidence in documents prepared by the county attorney in his capacity as coroner. Thompson claimed that the suppression of potential exculpatory evidence was further ground for a new trial based upon prosecutorial misconduct.

In a December 6, 1993, hearing, the county attorney testified that he compiled the information for the death certificate from the Knox County sheriff's office, the pathologist, and the pathologist's preliminary autopsy report. The county attorney stated that Dr. Randall had told him and had testified that two gunshot wounds caused Frank's death. When asked if he disclosed to defense counsel the pathologist's preliminary report, the county attorney replied: "I believe so, I'm almost certain." The county attorney testified that he did not provide defense counsel with a copy of the death certificate and responded affirmatively when asked if, at the June 1, 1992, hearing, he represented to the court that he had not made a coroner's report regarding Frank's death. The county attorney also stated that he calculated the time interval on the death certificate based upon Thompson's call to the sheriff and the pronouncement of death as obtained from the sheriff's office.

Additionally, the record made at the original trial and the report of the rescue squad disclosed that a local physician, Dr. Pavlik, had pronounced Frank dead at 7 p.m.

Following the hearing, the trial court held that under Neb. Rev. Stat. § 29-1912(1)(f) (Reissue 1989), Thompson was not entitled to discover the death certificate. Section 29-1912(1)(f) provides that the prosecuting attorney shall permit the defendant to inspect and copy "[d]ocuments, papers, books, accounts, letters, photographs, objects, or other tangible things of whatsoever kind or nature which could be used as evidence by the prosecuting authority." As to whether the death certificate could be considered exculpatory, the court held that the death certificate was immaterial and inadmissible because the county attorney's lay opinion regarding cause of death was incompetent. The court also held that the death certificate was not newly discovered evidence because it had been filed on August 29, 1991, and, thus, was accessible by writing to the Bureau of Vital Statistics. Last, as to whether the death certificate could be impeachment evidence, the court held that the certificate does not wholly reflect Thomas' conversation with Dr. Randall and is not "evidence of anything." The district court, therefore, overruled Thompson's motion for a new trial.

## ANALYSIS

Thompson alleged two grounds for a new trial. First, she argued that she received a copy of the death certificate, which she unsuccessfully tried to obtain through discovery motions, and thus sought a new trial based upon newly discovered evidence. Second, her supplemental motion argued that the county attorney suppressed exculpatory and impeachment evidence by misrepresenting the existence of evidence during a discovery hearing. Thus, Thompson sought a new trial based upon prosecutorial misconduct.

Thompson's motion for a new trial was filed on May 24, 1993, and its supplement filed on November 23, 1993. A jury found Thompson guilty of first degree murder on August 19, 1992. In relevant part, Neb. Rev. Stat. § 29-2103 (Reissue 1989) states:

The application for a new trial shall be by motion upon

written grounds, and may be filed either within or without the term at which the verdict is rendered. It shall, except for the cause of newly discovered evidence material for the party applying, which he could not with reasonable diligence have discovered and produced at the trial, be filed within ten days after the verdict was rendered unless unavoidably prevented.

Thompson does not assign as error the court's decision that the death certificate was not newly discovered evidence. Thompson asserts only that the district court erred in not ruling that the county attorney suppressed potentially exculpatory and impeachment evidence. This court interpreted the term "unavoidably prevented" in § 29-2103 as referring to circumstances beyond the control of the party filing the motion for new trial. *State v. Hawkman*, 198 Neb. 578, 254 N.W.2d 90 (1977). The law requires diligence, and mere neglect will not entitle a party to relief. *Id.*

In Thompson's direct appeal, we refused to address her previous untimely motion for a new trial. *Thompson I.* Today, as in her direct appeal, Thompson did not show in the trial court grounds for being "unavoidably prevented" from filing a timely motion for a new trial. Defense counsel had an interest in a coroner's report, as evidenced by pretrial motions. As ruled by the district court, the one coroner document that defense counsel could obtain without any discovery motions was the death certificate on file at the Bureau of Vital Statistics. The failure to request a copy of the death certificate represents neglect, rather than a circumstance beyond Thompson's control. Thus, if the present action is viewed as an appeal regarding alleged prosecutorial misconduct, Thompson's failure to file within the constraints of the mandatory language in § 29-2103 precludes appellate review. As a result, we need not consider this untimely motion. See *State v. Atwater*, 245 Neb. 746, 515 N.W.2d 431 (1994) (refused to address untimely motion for a new trial but addressed the issue of suppression of material evidence in review of a motion for postconviction relief).

However, a claim of suppression of material evidence favorable to the accused, such as Thompson's, generally

appears before appellate courts in the form of an action for postconviction relief, such as a habeas corpus petition, as opposed to a motion for a new trial. See, e.g., *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *Snell v. Lockhart*, 14 F.3d 1289 (8th Cir. 1994); *Patterson v. Black*, 791 F.2d 107 (8th Cir. 1986), *cert. denied* 479 U.S. 1036, 107 S. Ct. 890, 93 L. Ed. 2d 842 (1987); *Ogden v. Wolff*, 522 F.2d 816 (8th Cir. 1975), *cert. denied* 427 U.S. 911, 96 S. Ct. 3198, 49 L. Ed. 2d 1203 (1976); *Williams v. Wolff*, 473 F.2d 1049 (8th Cir. 1973); *State v. Atwater, supra.* Thus, we may address the merits of this appeal out of concern for judicial economy because Thompson could bring this claim again in an action for postconviction relief.

Thompson relies on the Supreme Court's holding in *United States v. Bagley, supra.* In *Bagley*, the government responded to a discovery request by disclosing affidavits from key witnesses attesting that their statements were given without any consideration from the government. Approximately 3 years after sentencing, Bagley discovered that the witnesses in question were paid $300 for providing information, assisting, and testifying in regard to the government's actions against Bagley. Bagley subsequently filed a federal habeas corpus motion. The Supreme Court rejected any distinctions between exculpatory and impeachment evidence. The Court held that the prosecutor need not deliver the entire case file to defense counsel, but must disclose evidence favorable to the defendant that, if suppressed, would deprive the defendant of a fair trial. The Court also held that regardless of whether the defendant made a discovery request, constitutional error exists if the government failed to disclose evidence favorable to the accused that is probably sufficient to undermine confidence in the outcome. As to the merits of the case, the Court found that the misleading affidavits affected the ability to impeach key witnesses. Thus, the Court remanded the cause to determine whether disclosure of the government's inducement to obtain testimony would affect the trial result.

Thompson argues that, similar to *Bagley*, the county attorney misled her by denying the existence of documents

relating to his capacity as a coroner. Thompson claims in her brief that the county attorney's alleged misrepresentation led her counsel to believe that documents outside of the pathologist's autopsy report did not exist, and that is why defense counsel did not seek out Frank's death certificate. Even assuming the death certificate has any material value, all counsel had to do was request the certificate from the Bureau of Vital Statistics, which could have been accomplished approximately 1 year before trial. Furthermore, under *Bagley*, what must be addressed is not solely the county attorney's failure to disclose the death certificate, but whether the death certificate could have resulted in a different outcome.

Thompson states that she would have offered to use the death certificate as impeachment evidence against Dr. Randall, a key witness in the government's prosecution. In *State v. Brown*, 214 Neb. 665, 335 N.W.2d 542 (1983), the convicted robber filed a motion for a new trial, within 10 days of the verdict, alleging that the government withheld a telephone conversation with a psychologist who described the victim as a pathological liar and withheld a conference with a pathologist who found the victim's injuries inconsistent with the victim's description of the assault. This court held that while matters affecting the credibility of a major witness are material, it was not prejudicial for the State to withhold the commentary of a nonexamining psychologist. As to the pathologist, however, we held that a pathologist's opinion casting doubt on a key witness is material and must be disclosed to the accused. In the present case, however, the death certificate is a form completed by a county attorney after consulting sources, not the opinion of a pathologist. Thus, the death certificate is more analogous to the nonexamining psychologist's opinion which did not call for disclosure.

Thompson relies on *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), in which the Supreme Court held that the government's failure to disclose an understanding or agreement not to prosecute a key witness was material because defense counsel could use the information to attack the witness' credibility. Thompson argues that *Giglio* supports her contention that the death certificate is material impeachment

evidence against Dr. Randall. In *Giglio*, however, the Court also held that the government's case depended entirely on the witness in question. Thompson's argument wrongly assumes that her conviction rested entirely upon the time of death. The record indicated that Thompson fired three shots downward toward the floor, contradicting her testimony that she fired six consecutive shots at a standing Frank. The trajectory of the shots indicated that Thompson fired the shots from the dining room, contradicting her testimony that she fired the shots from next to the computer. The record indicated that authorities observed blood only where Frank was found lying, contradicting Thompson's testimony that Frank moved around after being shot. Thompson's argument ignores the letters to her son that showed the malice she felt toward Frank, her purchase of ammunition and target practice just prior to the killing, and her use of a large-caliber handgun when she had Mace and a small-caliber handgun in her house. See *Thompson I*. In her direct appeal, we held:

> Based upon all the direct and circumstantial evidence in this case, the jury could have found beyond a reasonable doubt that the defendant's words and conduct in the days and hours before the shooting, as well as the circumstances surrounding the shooting itself, were sufficient to prove that the defendant intended to kill Frank and that she did so with deliberate and premeditated malice . . . .

244 Neb. at 403, 507 N.W.2d at 272. Thus, when we consider the entire record, it is inconceivable that a death certificate that merely noted the time interval between Thompson's call to the sheriff and Frank's pronounced death could result in a different outcome. See *Patterson v. Black*, 791 F.2d 107 (8th Cir. 1986), *cert. denied* 479 U.S. 1036, 107 S. Ct. 890, 93 L. Ed. 2d 842 (1987) (failure to disclose laboratory results despite discovery requests not material in light of other evidence on the record incriminating the defendant).

The government may not withhold impeachment evidence that is material. See, *U.S. v. Ailport*, 17 F.3d 235 (8th Cir. 1994), *cert. denied* _____ U.S. _____, 114 S. Ct. 2756, 129 L. Ed. 2d 872; *State v. Jackson*, 231 Neb. 207, 435 N.W.2d 893 (1989).

Thompson stresses the value of the time interval between onset and death noted in the death certificate. The county attorney testified that he completed the death certificate form after discussing the cause of death with Dr. Randall and consulting Dr. Randall's preliminary autopsy report, as well as records from the sheriff's office. The county attorney testified that Dr. Randall described the cause of death as two fatal wounds to the kidney and liver. The county attorney also testified that he disclosed the autopsy report to defense counsel. Furthermore, the county attorney testified that he calculated the time interval based upon when Thompson called authorities saying she shot Frank and when Dr. Pavlik pronounced Frank dead. The information used to calculate the time interval, as well as the cause of death, existed on the record from the sheriff's reports and Dr. Randall's autopsy report. Therefore, the information withheld from Thompson existed in the record through other sources. In any event, it was the work of the county attorney, not the pathologist, and was accessible through the Bureau of Vital Statistics. Thus, the time interval on the death certificate is cumulative, as well as incompetent.

In *State v. Hankins*, 232 Neb. 608, 441 N.W.2d 854 (1989), we denied the accused access to medical records which showed that a chief prosecution witness had poor memory. We held that the evidence had bearing on the witness' credibility and should have been available to the defendant. We also held, however, that the witness' memory difficulties existed on the record through other sources, making the medical records cumulative. As a result of the information's cumulative nature, a reasonable probability did not exist that disclosure could result in a different outcome.

Last, the death certificate is simply not admissible. Both parties rely on *Vanderheiden v. State*, 156 Neb. 735, 57 N.W.2d 761 (1953). In *Vanderheiden*, a jury found the defendant guilty of murdering his wife, and on direct appeal, this court affirmed the conviction of second degree murder. Vanderheiden argued that the trial court erred in refusing to admit a copy of the victim's death certificate to show the cause of death and for purposes of impeachment. This court affirmed the trial court's judgment, holding that death certificates are not admissible to

show cause of death because they are made ex parte without a hearing and without the right of cross-examination. As to offering the death certificate for impeachment of pathologists' testimony, we held that the death certificate was not admissible because the pathologists did not make the death certificate, and the certificate did not impeach the coroner who completed it.

Similar to *Vanderheiden*, Dr. Randall did not complete the death certificate, and therefore, it could not be used to impeach him. Thompson argues that the county attorney completed the certificate based upon information derived from Dr. Randall. The record indicates that the county attorney calculated the time interval based upon information from the sheriff's report, not upon a conversation with Dr. Randall. The death certificate is not admissible if offered to prove the cause of death. The death certificate is not admissible as impeachment of Dr. Randall because Dr. Randall did not make the death certificate, the certificate does not wholly reflect Dr. Randall's discussion with the county attorney, and the certificate does not conflict with Dr. Randall's testimony or the government's case against Thompson in general.

We do not condone the action of the county attorney in advising the court and the defendant that he did not prepare a coroner's report and in failing to reveal that he did in fact prepare a certificate of death. However, it is apparent that the law, Neb. Rev. Stat. § 71-605 (Reissue 1990), requires that if death occurred by unlawful means, the county attorney, within 24 hours of taking charge of the case, shall show on the death certificate the cause of death. In turn, a certificate of death shall be filed with the Bureau of Vital Statistics within 5 business days after the death, and a copy shall be available to the public, pursuant to Neb. Rev. Stat. § 71-612 (Reissue 1990). That certificate was available to Thompson at any time after August 23, 1991.

However, for the reasons we have set out above, we determine that the death certificate could not have furnished independent evidence of the time or cause of death and would not have been available for impeachment purposes under the circumstances. The certificate would not have created a reasonable doubt of guilt that otherwise did not exist. See *State*

*v. Atwater*, 245 Neb. 746, 515 N.W.2d 431 (1994). Accordingly, we affirm the judgment of the trial court in denying the motion for a new trial and the supplement to the motion for a new trial.

AFFIRMED.

CAPORALE, J., not participating.